## Moore *against* Harrisburg Bank.

A mortgage does not necessarily merge or become extinct, by being united in the same person with the fee; but on the contrary, when it was the intention of the parties that it should not merge, but continue to subsist for the protection of the owner of the fee from subsequent incumbrances, he may keep it on foot, sue out a *scire facias* upon it in the name of the mortgagee against the mortgagor, with notice to himself, obtain a judgment and sell the estate mortgaged.

ERROR to the common pleas of *Cumberland* county.

The Harrisburg Bank, for the use of James Bredin's creditors, against John D. Mahon, with notice to John Moore and William Moore, terre tenants. *Scire facias post annum et diem* to revive a judgment, with notice to the terre tenants, who appeared and pleaded that they held no land bound by the lien of the original

judgment; to which the plaintiffs replied, that they did hold lands bound. Issue.

The plaintiffs gave in evidence a judgment of the Harrisburg Bank *v.* John D. Mahon, for 3000 dollars, entered 18th of April 1831. *Scire facias* upon it to August term 1832, and judgment upon it 17th of January 1833. And to revive these judgments, the *scire facias* in this case issued, with notice to the terre tenants. On the trial of the cause, the plaintiffs specified the mill property, and house and lot in Carlisle, as that upon which they claimed to have the lien. And to show title in John D. Mahon on the 18th of April 1831, when their judgment was obtained, they gave in evidence the deed of John D. Mahon to John Moore, dated 27th of June 1831, and recorded the same day, for the property above mentioned.

The defendants then gave in evidence as follows:

Articles of agreement made and concluded, this eighteenth day of June A. D. one thousand eight hundred and thirty-one, between John D. Mahon, of the county of Cumberland and state of Pennsylvania, of the one part, and John Moore, of the same county and state aforesaid, of the other part, as follows, to wit: The said John D. Mahon, for the consideration hereinafter mentioned, agrees to convey by good and sufficient conveyances in law, unto the said John Moore and his heirs, free from all incumbrances whatever, (except what is hereinafter specified,) all those tracts or parcels of land as follows, to wit: The tract of land situate in South Middleton township, and county aforesaid, bounded by lands of Searight Ramsey, Henry Burkholder, Craighead and others, containing two hundred and twenty-eight acres, more or less; and having thereon erected one grist-mill and one distillery, (now in possession of Dr Mahon,) together with the appurtenances—it being the same tract of land that formerly belonged to the heirs of Elizabeth Laird. It is understood, however, that the apparatus used in distilling, and belonging to the said Dr Mahon, consisting of copper stills, boilers, tubs, &c., are excepted. Also, the adjoining tract of wood-land, containing forty-eight acres, more or less; and the tract of fifteen acres, more or less, with a house thereon erected; said two last tracts being those that were purchased from Searight Ramsey, by the said John D. Mahon. Also, the land on which the hog-pens of the distillery are erected, containing one acre, more or less—it being part of the land conveyed to the said Mahon by John McClure. The said several tracts of land are to be conveyed by the said John D. Mahon to the said John Moore and his heirs, by deed, with general warranty, and free from all incumbrances, except the mortgage (on the mill or Laird tract,) which was given by the said John D. Mahon to Griffith Evans, of Philadelphia, to secure the payment of ten thousand dollars. This mortgage is to remain on said land, and be paid off as is hereinafter set forth.

In consideration whereof, the said John Moore agrees to convey

to the said John D. Mahon and his heirs, by deed with warranty, his undivided interest in Augusta and Mary Ann Furnace, and all the lands appertaining thereto. Also, his undivided interest in the Kring farm and the Clippinger farm—(the balance of purchase-money due, or to become due, on the Clippinger farm, and on the furnace lands, to be paid for by the said John D. Mahon, to whom the said Moore is afterwards to account for his proportion of said debts so paid.) The said Moore is also to convey to the said Mahon, all his interest in the stock of the said furnaces; said Moore reserving the right to take therefrom three horses, and the harness for them, such as said Moore shall select. It being understood that the amount of stock in which Moore has an interest, is to be equal to what was on the ninth day of March, A. D. one thousand eight hundred and thirty.

The said Moore is also to assign to the said Mahon the lease made by the said Moore, to Cornelius Garretson, of the upper or Augusta Furnace, and the balance of Moore's term, for the residue of the furnaces and the lands appertaining thereto—that is, the said Mahon is to be in the same situation that the said Moore now is, under the lease from said Mahon and Jacob M. Haldeman, to said Moore—Mahon receiving the rent from Garretson, and paying to the said Jacob M. Haldeman, the rent that will be coming to him—and discharging the said Moore from all liability therefor to himself, the said Mahon. The assignment of said lease to Garretson, and of Moore's interest in the balance of his term, to take effect from, and be, as if made on the ninth day of March last. Possession of said furnaces, property, &c., to be given to said Mahon, when he shall have complied with the foregoing covenants on his part, in this indenture contained. It is also understood, that the mortgage of ten thousand dollars to Griffith Evans, aforesaid, is to be paid by the said Moore, as follows, to wit: Five thousand dollars on or before the first day of September next, and the balance of five thousand dollars in three years from the date of this agreement; for which payment, so to be made by him, he is to be re-imbursed by the said John D. Mahon, who is to pay to the said Moore, on said payments being made, equal amounts in money, or else in pig-iron, at the market price. That is, to pay John Moore, as aforesaid, five thousand dollars, on his paying the first five thousand to Griffith Evans, and the remaining five thousand, also in money or pig-iron, immediately upon its being paid by Moore to Evans, to secure which, and to guard against the lien remaining on the said mill tract, the said Mahon is to give to the said Moore, a mortgage for ten thousand dollars, on the lands conveyed, or to be conveyed as by this agreement, by the said Moore to the said Mahon.

It is further understood, that the said John D. Mahon, and his assigns, are to have the privilege of digging ore on the land conveyed, or to be conveyed in pursuance of this agreement, to the

said Moore. This privilege, however, is to extend only to the digging and using of ore, in and for Chesnut Grove Furnace, Adams county, and is to be confined to five acres of the said land, within which a mine is now opened—that is, to five acres lying in one undivided parcel, and immediately adjoining the mine now open.

It is understood that the said Moore is not bound to make any of the payments to the said Griffith Evans, until Mr Mahon shall have complied with his covenants in this agreement set out. The said John Moore is also to convey to the said Mahon, and his heirs, his interest in the Conogocheague property, purchased from Thomas Chambers. Also in the property situated on Conodoguinet creek, and purchased from Oher and Lesher—and the interest he has in the Roxborough Forge, and lands thereunto appertaining; said Mahon stipulating to convey one-half of said interest in Roxborough, to C. Garretson—and the said Garretson and Mahon are to be accountable for the debts due on the said Roxborough property, excepting the claim of the said Moore for advances heretofore made on the same—the debt due to the said John Moore, of twenty-five hundred dollars or thereabouts, for pig-iron, is to be paid to the said Moore by the said Mahon and Garretson.

It is further the understanding of the parties hereto, that the said Moore is not to have possession of the distillery, cooper's shop and distiller's house, until the eighteenth day of June, A. D. one thousand eight hundred and thirty-three; nor of the merchant and grist mill, until the eighteenth day of December next—the same with the usual privileges, miller's house, &c. being reserved for the use of the aforesaid David N. Mahon. It is further agreed between the parties, that the five thousand dollars to be paid by the said Moore, to the aforesaid Griffith Evans, on or before the first of September next, is to be paid by John D. Mahon to said Moore, as follows, to wit: One hundred ton of pig-iron, within one year after said first day of September, and the balance in pig-iron in the next year thereafter. The said Mahon also stipulates to repay the said Moore in like manner, the second five thousand to be paid by him to the said Evans, within the term of two years after said payment is made; the said Moore being entitled to interest on said payments, from the time they were made by him to said Evans.

It is also understood, that the unfinished contracts made by John Moore, aforesaid, to supply pig-iron to John M. Woodburn, A. Carden, Stevens and Arnold, and all others, shall be assigned to the said John D. Mahon, who is to complete the same, and to receive therefor payment for the proportions finished by said Mahon. The parts of the same, now completed, are to be settled for with the said John Moore, by the parties to said contract.—In testimony whereof, the parties hereto, have hereunto set their hands and seals the day and year first above written.

JOHN D. MAHON, [L. S.]

JOHN MOORE, [L. S.]

VIII.—N

William Line, Esq., sworn.—I was not present when the article between Moore and Mahon was executed. Mr Moore and Mr Mahon called at my house, I think they furnished me with the articles of agreement; they requested me to draw deeds for the properties. They seemed to be very anxious to have them drawn immediately. I sent for Doctor Bowman to come and draw one— he did so—I drew the other: some other papers, I think, drawn at the same time, one of which was a mortgage. After the papers were drawn, they came and requested me to come in and take the acknowledgments. I did so. Came to Mr Mahon's house. After the papers were acknowledged, Mr Moore objected to take the deed on account of liens against the property, to a large amount, which I think he said he was not aware of. There was some altercation. They ultimately agreed to go up to Mr Carothers' office —they did so. A mortgage was spoken of, or more, to Griffith Evans of Philadelphia. Mr Carothers advised the mortgage to be paid off by Moore. The proposition, I think, first came from Mr Mahon, that the mortgage should be paid off by Mr Moore; and an assignment was to be had from him, to secure Mr Moore. They agreed, and made arrangements to go off to Philadelphia, for the purposes of the arrangements, the next morning. I understood they did go. They afterwards said they had accomplished their object.

I am acquainted with the parts of the said tract—have surveyed them—it consists of three parts. Laird tract; eighteen acre tract got from Ramsey, embracing the water, principal part—another of Ramsey, about forty acres. There is a large mill on the Laird tract. It depends entirely for its usefulness, on the eighteen acre tract, as it contains the water right. The Laird tract, without the water works, would, perhaps, be worth thirty or forty dollars per acre, in 1831.

Cross-examined.—Mahon gave, as I understood, 12,000 dollars. There was a mill then—knew that Mahon built a large new mill— two tenant houses built, distillery, &c.—improved very much. The old mill was supplied with water chiefly by Bonnybrook. It is not used for this mill, it is not on this property. Both mills could not have been in operation.

I think it was in 1831, when Mahon and Moore were at my house. It is likely it was shortly after the date of the agreement, probably in the month of June. They went to Philadelphia the following day, as I understood. The arrangements at Mr. Carothers' office, were not put in writing. It was after the execution of the papers. Two deeds, I am certain, perhaps a mortgage—I am certain there was. I can not state the purport of the mortgage. I think it was a security to Mr Moore—can not remember. I drew the mortgages. They told me, on their return, they had got the arrangements made. I can not remember if they told me the particulars. They did not tell me how the mortgages were to be

paid, as I remember. The deeds were out of my possession after the meeting at Mr Carothers' office. I do not remember them after they were acknowledged, at Mr Mahon's house. There was an interlineation in the mortgage from Mahon to Moore. The estimated value of Moore's right in the furnaces, transferred to Mahon, was 30,000 dollars.

Mortgage, John D. Mahon to Griffith Evans, dated 27th of April 1824, recorded 1st of May 1824, on the Laird property, 228 acres and 31 perches, more or less, conditioned for the payment of 5000 dollars four years after date, with interest to be paid half yearly from date.

Mortgage, John D. Mahon to Griffith Evans, dated 17th of January 1828, on the same property, conditioned for the payment of 5000 dollars five years after date, interest from date payable half yearly, recorded 22d of January 1828. This mortgage has this assignment on the margin, to wit: " Thomas Elder, Esq., attorney in fact for Griffith Evans, on the 8th of August 1831, in consideration of 5075 dollars 83 cents, paid by John Moore, and being the full amount then due, assigns the mortgage and bond to said John Moore."

Power of attorney from Griffith Evans to Thomas Elder, Esq., as follows:

Philadelphia, July 2, 1831.

Thomas Elder, Esq., Harrisburg:—Sir: Mr Mahon having made arrangements for discharging my second mortgage, dated 17th of January 1828, for 5000 dollars, and it is desired by Mr John Moore, who, I understand, is to pay the money, that the mortgage should be assigned to him.

Therefore I, by these presents, constitute you my true and lawful attorney for me, and in my name to assign, transfer and make over to the said John Moore, his heirs and assigns, all my right, title and claim to the debt and interest secured, or intended so to be, by the said mortgage, together with bond and warrant accompanying the same, and all other advantages and facilities appertaining thereunto; hereby ratifying and confirming all my said attorney may lawfully do in the premises. He, the said John Moore, first paying into your hands, for my use, the said principal of 5000 dollars, and interest thereon, from 27th of April last.

Given under my hand and seal, this 2d of July 1831.

Signed,        Griffith Evans. [L. s.]

Acknowledged same day, before a magistrate.

Recorded in Cumberland county, 8th of August 1831, in Record book N. N., vol. 1, page 389.

Mortgage, John D. Mahon to John Agnew, dated 5th of April 1828, conditioned for payment of 3192 dollars on 1st of April 1831, with interest payable annually, secured on the Laird tract, recorded 7th of April 1828.

Satisfied by John Agnew, 26th of July 1831.

[Moore v. Harrisburg Bank.]

Judgments against John D. Mahon.

1. The Carlisle Bank *v.* John D. Mahon, co-promisor with R. Henry Lee. No. 63, November term, 1830. November 1830, judgment. Real debt 214 dollars, interest from 6th of October 1830.

2. Same Plaintiff *v.* Stephen Duncan and John D. Mahon. No. 83, November term, 1830. 8th of November 1830, judgment for 6000 dollars, interest from 26th of October 1830.

3. Same Plaintiff *v.* John D. Mahon, Esq. No. 104, January term, 1831. 1st of February 1831, judgment confessed for real debt, 2500 dollars.

4. Same Plaintiff *v.* John D. Mahon, Esq. No. 105, January term, 1831. 1st of February 1831, judgment, real debt 460 dollars 12 cents, interest from 1st of April 1831.

The following agreement, dated the 27th of June 1831, forms part of the record of the above four judgments, viz:

The liens of these judgments on the mill, distillery and four tracts of land, conveyed by John D. Mahon and wife, to John Moore, by deed dated the 27th June, 1831, are released by the Carlisle bank; in consideration whereof the said Mahon agrees that the Mary Ann and Augusta Furnaces, and the lands thereto appertaining, the Kring farm and the Clippinger farm, and all the lands, rights and privileges conveyed by John Moore and wife, to the said Mahon, by deed dated the 27th June 1831, are bound by the lien of these judgments, as fully as if writs of *scire facias* had issued against the said Mahon, and judgments thereon been regularly confessed, immediately after the date and delivery of said deed—subject only to the lien of a mortgage from the said John D. Mahon to the said John Moore, for securing the payment of 10,000 dollars, dated 27th June 1831, which deeds and mortgages are on record.

George McFeely *v.* John D. Mahon. No. 39, April term, 1831. Judgment by *nihil dicit*, April 12, 1831. Real debt, 954 dollars. Interest from 12th April 1831.

Harrisburg Bank endorsee of George Croft, John Moore and Samuel Galbraith *v.* John D. Mahon. No. 26, April term, 1831. 18th April 1831, judgment for 900 dollars. Interest from 14th May 1830.

Harrisburg Bank endorsee of John D. Mahon *v.* John D. Mahon. No. 28, April term, 1831. 18th April 1831, judgment for 1000 dollars. Interest from 14th May, 1830.

The Harrisburg Bank endorsee of James Bredin *v.* John D. Mahon. No. 60, April term, 1831. 18th April 1831, judgment. Real debt, 3000 dollars. Interest from 9th June 1830.

This is the judgment in controversy.

Mortgage, Mahon to John McClure, 23d February, 1827, for payment of 3625 dollars, due the 21st of April, 1828, embraces the Hog-pen tract.

[Moore v. Harrisburg Bank.]

The following proceedings on the mortgage assigned by Evans to Moore, were given in evidence.

Griffith Evans *v.* John D. Mahon, with notice to John Moore, terre tenant. No. 21, August term 1834, *scire facias sur* mortgage. 28th June 1834, judgment confessed by Mahon. 7th July 1834, judgment confessed by Moore.

No. 16, November term 1834; *levari facias;* debt 5000 dollars; interest from the 17th of June 1834. 26th September 1834, mortgaged property sold to William Moore for 1650 dollars.

13th November, 1834, on motion of Mr Alexander and affidavit of Mr. Shoch, filed rule to show cause on Saturday the 6th of December next, why the sale made by the sheriff, of the real estate of the defendant on this writ to William Moore, shall not be set aside. 9th December 1834, on argument it is claimed on part of the Harrisburg Bank, the creditors of Bredin, &c. that the sale be set aside, and also the judgment be opened. It is by consent, considered as if the rule was enlarged so as to show cause why the sale should not be set aside, and also why the judgment should not be opened—both now to be considered. After full argument, the court ordered the deed to be acknowledged, and refused to open the judgment on which the *levari facias* issued.

By the Court.— *Venditioni Exponas*, No. 91, April term 1834, proceeds of Bredin's property brought into court for appropriation. The Harrisburg Bank satisfied out of these moneys, and the judgment in controversy marked for the use of Bredin; for the use of his creditors 22d September 1834.

The counsel for the terre tenant, John Moore, requested the court to charge the jury, that under the facts given in evidence, he had a right to take an assignment of the mortgage of Griffith Evans for his own protection, against the subsequent lien creditors of John D. Mahon, and that his proceeding upon it to a sale of the mortgaged premises, divested the lien of the judgment of the Harrisburg Bank, and the plaintiffs could not recover.

In answer to which the court instructed the jury that John Moore, being the owner of the fee by purchase from John D. Mahon, the moment he became the owner of the mortgage also it merged in the fee and became extinct; and that the *scire facias*, subsequently issued upon it against the mortgager with notice to himself, was a mere nullity, and did not divest the lien of the judgment of the bank, and that the plaintiffs were entitled to recover.

To this opinion exception was taken by the defendant, and the court sealed a bill of exception.

*Stevens* and *Alexander*, with whom was *Watts*, for the plaintiff in error, contended that a merger only happened when it was indifferent to the party in whom the greater and less estate met; and never against his interest, and more especially when it was against his intention and his contract, as in this case; and cited 18

VIII.—N*

[Moore v. Harrisburg Bank.]

*Vez.* 389; 1 *Rawle* 193; 3 *Johns. Chan.* 52; 6 *Johns. Chan.* 434; 5 *Watts* 456.

*Biddle* and *Williamson, contra,* argued that the parol testimony should not be permitted to vary the written contract of the parties; 1 *Rawle* 108; 4 *Rawle* 130. As a general principle, the doctrine of merger is applicable; but it is especially so in this case, where third persons have been invited to deal with the parties upon the legal presumption of a merger. 6 *Johns. Chan.* 423; 7 *Car. Eng. Chan.* 524.

The opinion of the Court was delivered by

KENNEDY, J.—Being of opinion that the court below erred in their direction to the jury on the question of merger, raised in this case; and that a correction thereof, in this particular, will dispose of and determine the whole matter in controversy, between the parties, in favor of the plaintiffs in error, John and William Moore, it is, therefore, rendered unnecessary to notice or to pass upon the other matters assigned for error.

The agreement for the purchase of the lands in question, by John Moore, of John D. Mahon, appears to have been entered into on the 18th day of June A. D. 1831. John D. Mahon, by the agreement, which was executed under the hands and seals of the parties, bound himself, in the first part of it, "to convey by good and sufficient conveyance in law, unto the said John Moore and his heirs, *free from all incumbrances whatever* (except what is thereafter specified) all those tracts or parcels of land as follows:" then describing them.) And again, in a subsequent part thereof, it is provided, that "the said several tracts of land are to be conveyed by the said John D. Mahon to the said John Moore and his heirs, by deed, with *general warranty* and *free from all incumbrances,* except the mortgage on the mill or Laird tract, which was given by the said John D. Mahon to Griffith Evans, of Philadelphia, to secure the payment of ten thousand dollars. This mortgage is to remain on said land, and to be paid off as herein set forth." This is the only incumbrance that is mentioned, as being excepted, in the agreement, and consequently is the same that is referred to, in the first part of the agreement, containing the covenant on the part of Mr Mahon, to convey the lands clear of incumbrances. By the agreement, Mr Moore binds himself to pay off the mortgage to Mr Evans of ten thousand dollars, (though, in fact, two mortgages, of five thousand dollars each, were intended to be embraced by the mention of one, of ten thousand dollars,) within certain periods therein set forth. And Mr Mahon, again, covenants to reimburse Mr Moore within specified periods after the latter shall have paid the mortgage, in the way therein agreed on. But notwithstanding all this, the parties expressly agreed further, that "it is to be understood that the said Moore is *not bound* to make any of the pay-

[Moore v. Harrisburg Bank.]

ments to Griffith Evans, *until Mr. Mahon shall have complied with his covenants in the agreement set out.*" It also appears from the evidence of Judge Line, who was employed by the parties to draw and prepare for execution, the several deeds of conveyance and mortgage mentioned in the agreement, so that the agreement might be carried into effect, that after having done so, and each party had signed and sealed such as were to be executed by him; and he had taken the acknowledgments of the same, Mr Moore objected to taking or accepting the deed of conveyance from Mr Mahon, on account of liens against the property, conveyed by it to a large amount, that he was not aware of. That after some altercation, they finally agreed to go to Mr Caruthers' office, with a view, as it seemed, by means of his advice, to try and adjust the difficulty, and accordingly went. The mortgage to Mr Evans was there spoken of, and Mr Caruthers advised that this mortgage should be paid by Mr Moore, and an assignment thereupon taken of it to himself, that he might by means thereof make himself secure. This proposition, as Judge Line thought, came first from Mr Mahon himself, and was agreed to by Mr Moore; and they, in order to make some preparations for the accomplishment of it, agreed to set off the next day for Philadelphia, where Mr Evans resided, to see him on the subject. The evidence of Judge Line has been objected to by the counsel on behalf of the bank or the defendants, because, as they contend, it goes to alter and change materially the effect of the written agreement between the parties, as also the deeds executed by them to each other, in pursuance of it. The rule, however, which prohibits parol evidence from being admitted and taken into consideration, when its tendency is to alter, vary, contradict, add to, or impair, a deed or written instrument, is not applicable here: because the utmost the counsel for the defendants in error can claim, is, that from the written agreement and deeds executed in fulfilment thereof, when taken together with the subsequent payment made to Mr Evans, of the amount of the mortgage by Mr Moore, notwithstanding it was thereupon assigned to the latter by the former, that a presumption of law arose, that it was paid by Mr Moore in discharge of an obligation imposed upon him by his written agreement, and that the mortgage thereby became extinguished. But this being a presumption merely, may, in most cases, I apprehend, be rebutted by other evidence, either written or parol.

It may be, however, and it would seem as if there are cases in which it was held, that the law produced a merger even in opposition to the intention of the parties as it appeared upon the face of the deed or written instrument itself; as where a lease for years and a remainder for life were limited to the same person by the deed, the estate for years was held to merge in the estate for life. 1 *Inst.* 54 *b.* Uthen *v.* Godfrey and others in note to *Dyer* 309; Clark *v.* Sir John Sydenham, *Yelv.* 85. But it has been said and contended since, that there is no rule or case in which a merger

shall be permitted to take place when the several estates may stand; and that merger only takes place when it is necessary to preserve the intention of the parties. Stevens *v.* Bretridge, *Ld Raym.* 36; 1 *Lev.* 36. And, though this may not be altogether true or strictly correct, yet it will be found that there are many instances in which, with a view to carry the intention of the parties into effect, the law of merger has been held inapplicable; and where, as Sir William Grant, master of the rolls, in Forbes *v.* Moffatt, 18 *Ves.* 390, says, "A court of equity is not guided upon this subject by the rules of law. It will sometimes hold a charge extinguished, where it would subsist at law; and sometimes preserve it, where, at law, it would be merged. It is also very clear, that a person becoming entitled to an estate, subject to a charge for his own benefit, may, if he chooses, at once take the estate and keep up the charge. The question, in such case, is upon the intention, actual or presumed, of the person in whom the estates are united. In most instances it is, with reference to the party himself, of no sort of use to have a charge on his own estate; and, when that is the case, it will be held to sink, unless something shall have been done by him to keep it on foot." And, in conformity to this doctrine, he held, in that case, that a mortgage was not merged or extinguished by becoming united in the same person with the fee; because it was to be presumed that such was the intention of the party from the greater advantage being against merger in favour of the personal representatives; it not appearing from the acts or declarations of the party, what his actual intention was in regard to it. But in the case under consideration there is no room nor occasion to presume what the intention of Mr Moore was in paying to Mr Evans the amount of his mortgage, and taking an assignment of it to himself, after having become the owner of the fee; because it was expressly avowed and agreed that it should not sink, but be kept on foot for the purpose of indemnifying him against subsequent incumbrances existing against the estate, when he accepted of the deed conveying to him the fee in it. Hence this case does not rest on mere presumption, which would doubtless be also sufficient to prevent a merger of the mortgage, but is much stronger against it than the case of Forbes and Maffett. And Sir William Grant also further says, in that case, that "upon looking into all the cases in which charges have been held to merge, I find nothing which shows that it was not perfectly indifferent to the party in whom the interests had united, whether the charge should or should not subsist; and in that case I have already said it sinks." But here it is perfectly obvious that it made all the difference imaginable to Mr Moore, whether the mortgage was kept on foot by him or not, as long as the incumbrances created subsequently to it on the estate existed; and held to them by those who are now seeking to take the estate from him, in order to have their claims under those imcumbrances paid; so that if keeping the mortgage on foot will protect or save

him, it shows how important it was for him to do so.    In the case of Helmbold *v.* Man, 4 *Whart.* 410, this court recognised the principles and doctrine here mentioned in its fullest extent, and in deciding that case carried them much further than it is necessary to do here, in order to decide against a merger.    Parol evidence to prove the intention against merger was also admitted to a greater extent there than here.

It has, however, been argued that Mr Moore, under his written agreement with Mr Mahon, for the purchase of the estate, was bound to pay off the mortgage of Mr Evans; but it is clear also from that agreement that he was not bound to do so until Mr Mahon should first discharge and relieve the estate from all the other incumbrances upon it.    Mr Mahon's covenant, in this behalf, was not that he would make a deed containing a covenant on his part to discharge the estate from the incumbrances resting upon it, but that he would convey the estate by a deed with *general warranty,* and *free* from all incumbrances; that is, as I take it, *freed* and *discharged* from all incumbrances, and not with general warranty and *covenant* that is *free* from all incumbrances, with the exception of the mortgage to Mr Evans.    If it had not been the understanding of the parties in making their agreement that the estate should be freed and discharged from all incumbrances at the time when it should be conveyed, the phrase "and free from all incumbrances" was not, according to its ordinary acceptation, at all suited to express the meaning of the parties; but, according to its usual acceptation, was well adapted to convey the idea that the estate was not only to be conveyed with a covenant of general warranty on the part of Mr Mahon, but that it should, at the time of his doing so, be free from all incumbrances whatever, excepting the mortgage of Mr Evans.    Had it been the understanding of the parties that the incumbrances were not to be paid off and the estate released from them before it should be conveyed, but to allow a future day for that purpose, upon the faith merely of a covenant on the part of the grantor to do so, the time would have been mentioned and fixed.    This, however, not having been done, it is clear that the import of the original agreement is, that the estate was to be conveyed *freed* and *acquitted* from all incumbrances, except the Evans mortgage.    But Mr Mahon afterwards not being able to do this, Mr Moore refused to accept of the deed of conveyance from him; and then the verbal agreement, testified to by Judge Line, was made by the parties before Mr Moore would accept of the deed by which he was, upon paying the mortgage to Mr Evans, to take an assignment of it and to have the benefit of it for the purpose of protecting him in the estate against the other incumbrances, which are the same, that it is now claimed by the defendants in error, the estate ought to be made liable for without regard to the mortgage or the sale of the estate which was effected by a judicial proceeding upon it.    Mr Moore and Mr Mahon had a right to

change and alter the original agreement, in this respect, as they pleased. The lien creditors of Mr Mahon were not parties to it; and would not be said to have any interest in it. It was not competent for Mr Moore and Mr Mahon to make any agreement that would prejudice them in their rights; nor could they claim to control Mr Moore and Mr Mahon in changing their agreement, or in releasing each other from obligations created by it. They might have rescinded it *in toto* if they had pleased; and the creditors of Mr Mahon could not have objected thereto; nor would they have any cause to complain of it now.

But it has been said, that from the face of the written agreement and the circumstance of Mr Moore's having placed the deed, conveying the estate in fee to him, upon record, the creditors of Mr Mahon were justified in drawing the conclusion which, as they contend, the law made therein, that the Evans mortgage was paid and extinguished when taken up by Mr Moore; and having thus been induced to believe that it was so, they, therefore, became entitled to the benefit of a merger of it. It may be that a person who has become a creditor, or has parted with his rights upon the faith of a legal presumption of the merger of a mortgage, fairly raised by the acts of the party in whom the right to the mortgage and the estate in fee has become united, all of which is placed upon record, shall be entitled to have the mortgage considered merged as respects him, and that the holder of it shall not be permitted to gainsay it; yet it is clear here, that the persons claiming to have the benefit of a merger of the mortgage parted with nothing upon the faith of any such legal presumption. They had been creditors of Mr Mahon and obtained their liens upon the estate before; their condition was not made worse than before, by keeping the mortgage alive. Mr Moore having become the owner of the estate in fee, with the mortgage upon it as a charge, did not use their money or means in obtaining an assignment of the mortgage; he procured it with his own means, and not with theirs, nor yet with those of their debtor, Mr Mahon. In short, in no way whatever did either they or Mr Mahon contribute to the payment of the consideration upon which Mr Moore obtained an assignment of the mortgage from Mr Evans, and have therefore no colour, even of pretence, in equity, for claiming that Mr Moore should not have the same benefit and advantage from it that Mr Evans would have been entitled to, had he not parted with it to Mr Moore.

But this is not all; they had no ground whatever for making such presumption of the mortgage being merged, as is alleged. Because they, being themselves the holders of the incumbrances on the estate, must have known, if they looked at the original agreement, that by it Mr. Mahon was bound to discharge them before Mr Moore could be required to pay Mr Evans' mortgage. But knowing that their claims, under the incumbrances, were not paid, they consequently, so far as the written agreement went, had no

[Moore v. Harrisburg Bank.]

right to presume that it was in pursuance of it, that Mr Moore had paid and taken an assignment of the mortgage; because, until the incumbrances were satisfied and the estate freed from them, Mr Moore was not bound to pay the mortgage. If they, then, have lost any thing by lying by, because they believed the mortgage was extinguished, that otherwise they would have gained, it is chargeable entirely to their own mistake, or want of vigilance in not inquiring into the matter, so as to ascertain correctly the reason and object of Mr Moore's taking an assignment of the mortgage, when he paid it to Mr Evans.

But it is also said that the sale, made by the sheriff, of the estate, under the judgment obtained upon the mortgage, in the name of Griffith Evans, after his assignment of it to Mr Moore, is so irregular and repugnant to truth, as to be void and of no effect whatever. It is contended that the writ of *scire facias*, commencing the suit upon the mortgage, instead of being sued out in the name of Griffith Evans, ought to have been sued out in the name of John Moore, he having become previously the assignee of it; that then the irregular and anomalous character of the proceeding would have appeared, and been such as that the court would not have entertained it, because it would have appeared that the same person was plaintiff and defendant in the suit. And if this would have been its fate, had the proceeding been commenced and carried on without disguise, it ought not to avail the party himself any thing for having thus imposed upon the court. There is nothing in this objection. The writ of *scire facias* was well sued out in the name of the mortgagee; and it may be questionable, at least, whether it could have been sustained in the name of the assignee; because the claim in the action of *scire facias* is for money, and therefore a bare *chose in action*, and consequently not assignable at common law; and I am not aware that we have any statute expressly making it so. If it can be maintained at all, it must be by a constructive inference drawn from the act of 1705, proceeding for and directing the proceeding by *scire facias* upon a mortgage, when a year or more has run after it has become payable, for the purpose of obtaining payment of the mortgage-debt by a judicial sale of the estate granted by the mortgage. The *scire facias* being an action for the recovery of the debt, is altogether different from an action of ejectment founded upon a mortgage, which is brought for the recovery of the possession of the mortgaged premises, and rests entirely upon the right to the possession of the estate which is derived from the mortgage, and considered as transferable at common law. Upon this ground, it has been held that the assignee of a mortgage may maintain ejectment in his own name; but I am not aware that it has ever been held that he may maintain a *scire facias* in his own name.

In the next place it is proper to observe, that a *scire facias* upon a mortgage is not an action or proceeding *in personam*, but *in*

[Moore v. Harrisburg Bank.]

*rem.* And notwithstanding the *scire facias,* sued out in the name of Griffith Evans, was served upon Mr Moore, it was only because the sheriff found he was the terre-tenant of the estate in the mortgage, that he served the writ upon him. It was the estate, and the rights of those who had claims or liens upon the estate, that were to be affected by the proceeding, and not the personal rights of any one. Mr Moore was willing, though the owner of the estate in fee, to give it up to be disposed of by the proceeding upon his mortgage; and if he were willing to do so, upon what principle of equity or justice could any other object to it? I confess I can discover none. The proceeding by *scire facias* upon a mortgage, in this state, may be regarded as a substitute for a bill of foreclosure in a court of chancery. Having no court of this kind, the legislature adopted and authorised the *scire facias* to be sued out of our common law courts, and the proceedings directed to be had thereon, as an expedient for the bill of foreclosure. This being the purpose which the legislature intended, no doubt, to subserve by such writ, it would seem to be right, in order to attain the end, that whenever the party would be entitled to have the aid of a court of chancery to render a mortgage, of which he had become the holder, effectual, and to give him the full benefit of it when he desires it, though it be against his own estate, to permit him to maintain his action by suing out and prosecuting his writ of *scire facias.* It can not be pretended that John Moore would not have been entitled to the aid of a court of chancery, if we had had such, when he caused the writ of *scire facias* to be sued out and prosecuted upon the mortgage assigned to him by Mr Evans; or, if it should, the cases referred to above show conclusively that he would, for the purpose of having his mortgage made available to him, by relieving his estate from the subsequent charges upon it, so far as it might prove insufficient to pay them, after satisfying the amount of his mortgage first. We therefore think that the proceeding by *scire facias* upon the mortgage in the name of Mr Evans, and the sale of the estate which followed in pursuance thereof, were valid, and discharged the estate from all liens created subsequently to the recording of the mortgage.

Judgment reversed, and a *venire de novo* awarded.