Welch, J.
The firm of A. De Graff & Co. wore contractors on the Cincinnati and Western Railroad, and the Cincinnati, Cambridge and Chicago Railroad. The members of the firm were Andrew De Graff, William De Graff, and Simon Suydam.
The original petition was filed by William R. Collett, since deceased, as assignee of Simon Suydam, against the other members of the firm, the two railroad companies, Caleb B. Smith, their common president, and Robert G. Corwin.
The object of the petition was to obtain an account and settlement of the partnership concerns, and to set aside a conveyance of a valuable lot on Ninth street in Cincinnati, made by Smith to Corwin, and have the lot appropriated to partnership purposes, as part of the assets of the firm.
To reverse the final judgment of the Superior Court rendered in the case in special term, each party prosecuted a petition in error in general term. Upon the hearing of these petitions, the court in general term affirmed the judgment. And now, to reverse this judgment of affirmance, both parties are prosecuting petitions here—that filed by Collett’s executors being entitled as the original petition in error, and that filed by Corwin et al. as a cross-petition thereto.
*265 In both petitions numerous errors are assigned. But, as the case is only argued upon one side, and the record is exceedingly voluminous—containing 277 pages—we dispose of *the case upon a single question, noticing only so much of the record as will show-how it arises.
In April, 1853, the two railroad companies, by their common president, the said Caleb B. Smith, entered into a written contract with A. De Graff & Co. for the construction of the entire lines of their roads. In December, 1853, after some work had been done under the contract, a second written contract was executed by the parties, whereby the first-named contract was rescinded, upon certain terms specified, and among others, that the railroad companies should, within a time named, convey to the firm of A. De Graff & Co., “ by clear title,” $50,000 worth of feal estate situate in the city of Cincinnati. No conveyances were made under this agreement, and before the time limited for that purpose had expired, a third ■written agreement was entered into, by which certain lots and parcels of real estate in the city of Cincinnati were specified as those which were to be received by the firm, and conveyed by the railroad companies, including, among others, the lot on Ninth street. This last agreement provides that the lots and parcels named should be conveyed, “ by clear title, to be made when required by A. De Graff & Co.,” and that when conveyed they should “ be in full discharge of the contract of rescission.” The contracts were all signed by Smith, as president of the roads; and the lots specified were those, that had been agreed upon between him and the firm.
At the date of the last-named contract the title of the Ninth street lot was in said Caleb B. Smith, subject to a mortgage for $2,000, executed by a former proprietor to the Trust Company, and also to a mortgage for $5,000, executed by Smith to said Robert G. Corwin.
At or before the date of this contract, it was arranged and agreed between Smith and the railroad companies that Smith should let the companies have this lot, to be so put into the contract, and that the companies should pay him $20,000 therefor in other real estate; but'there is nothing, except by inference, to show when the payment was to be made. „
These facts were known to A. De Graff & Co. at the time of taking their contract for the conveyance of the lot; but Smith gave no intimation of any intention to reserve or assert a *claim or lien upon the lot, for the unpaid purchase money, or otherwise.
*266 The companies at that time were' solvent.
After making the third contract, part of the lots and tracts specified were convoyed by Smith, as president of the roads, upon the order of A. De Graff & Co., acting by Andrew De Graff, the only member of the firm then known to the railroad companies as such. Among those not so conveyed was the lot on Ninth street. Suydam then notified Smith that he was a member of the firm, and that he objected to the conveyance of any more of the lots; and requested Andrew De Graff to give no further orders for that purpose.
Meantime, Corwin had become indorser for Andrew De Graff for $12,000, upon Do Graff’s agreement to indemnify him as such indorser, by causing a mortgage or deed to be made to him for the Ninth street lot; and Smith, under the erroneous belief that Suydam had withdrawn his objection, and upon receiving from Andrew De Graff an order signed by him in the name of the firm, authorizing him to do so, made an absolute deed of the lot to Corwin, for the purpose of securing him as aforesaid. Smith at the same time executed to Corwin new mortgages, upon other property, to secure the payment of the $2,000 due the Trust Company and the $5,000 due to Corwin.
Pending the suit, Corwin sold the lot for $12,000, under an agreement of parties that he might sell the same and account for its value, in case it should bo declared and held to be in equity the property of A. De Graff & Co.
The new mortgages to Corwin proved worthless, the mortgaged property having been exhausted by prior liens thereon. The mort■gage to the Trust Company was paid by Corwin out of the $12,000 purchase money. Nothing has been paid on the $5,000 debt due from Smith to Corwin, and Smith, as well as Andrew De Graff and the railroad companies, have since become insolvent.
On the hearing of the case the court held Corwin liable to account to A. De Graff & Co. for the full value of the Ninth street lot, less the amount of the mortgage to the Trust Company, without any deduction for the $5,000 mortgage due to him, or for purchase money due from the railroad companies *to Smith; and this ruling of the court is the principal ground of error relied upon to reverse the judgment.
.We are inclined to hold with the court below, that, under the circumstances, Smith was estopped, as between him and A. De Graff & Co., from setting up qny claim for the unpaid purchase money of *267 the lot. The contract between him and the railroad companies in regard to the lot, is very indefinitely set forth in the record ; particularly as to when the $20,000 was to be paid, by the conveyance of other lands. But from the circumstances, and mainly from the fact that Smith made the conveyance, under the supposed order of A. De Graff & Co., before receiving, -or even asking for its payment, we are led to believe that it must have been the understanding of all parties that the payment was to be, or at least might be, deferred until after the conveyance to A. De Graff, which, it will be observed, was demandable immediately, and was to be by “ clear title.” At all events, we can not say from this record that the understanding was otherwise, which we must do in order to reverse the judgment on this account. It follows, if Smith was estopped, that Corwin, who took his conveyance with notice, was estopped also.
But we are clear in the opinion, that the amount of the $5,000 mortgage should have been deducted. The court seems to have proceeded upon the belief that this mortgage was merged, or extinguished, by the conveyance to Corwin. Such undoubtedly would have been the case, had the conveyance been suffered to stand. But the parties entitled to do so, have avoided the conveyance, and it has become as to them a nullity. They can not be allowed to dis-affirm it for the purpose of acquiring their rights in the property conveyed, and yet to affirm it for the purpose of merging those of Corwin. As long as they suffer the conveyance to stand, the rights of Corwin as mortgagee are merged in it; but when they choose to set it aside, they restore him to his former position. Had the conveyance never been made, as it is said on behalf of the firm it never should, the lot would have been taken by the firm subject to the mortgage. On what principle of justice, then, should an unauthorized, or even a fraudulent conveyance to Corwin, have the effect to transfer his ^mortgage to them? There is no such principle involved in the law of merger, as we understand it. A leading feature of that law is, that merger will never be presumed against the equities of the parties. Greenl. Cruise, 239; 6 Serg. & Rawle, 559; 5 Pet. 481; 7 Greenl. 381. To work a merger, which shall have such effect, there must be an unequivocal act of the party to be in-j uriously affected by it, absolutely and irrevocably relinquishing the right to be merged. 4 Kent Com. 102; 6 Conn. 373; 35 N. H. 421; 8 Watts, 138; 11 L. & Eq. 317. In the cases in 6 Conn, and *268 35 N. H., and also in Bell v. Woodward, 34 N. H. 90, even the cancellation or surrender of the mortgage note was held an insufficient act for that purpose. And the rule seems to obtain as well in cases of fraudulent conveyances by the mortgagor to the mortgagee, as where the conveyances are made in good faith. 1 Wend. 478. In the case in 35 N. H. 421, Ladd v. Wiggin, where a fraudulent conveyance, had been made by the mortgagor to tlje mortgagee, and the note and mortgage had been surrendered to the mortgagor, the court say : “ The general rule of law between parties is, that where a contract is avoided for any cause, each is restored to his previously-existing rights. The note was given up upon taking the fraudulent conveyance.....The very avoiding of the fraudulent conveyance revived and renewed the former valid lien, and restored the parties to their original position.....It is well settled that nothing but payment in fact of the debt, or a release by the mortgagee, will discharge a mortgage.” It is true that these stringent rules are not applied, where the equities of the parties can be better subserved by holding that there has been a merger. But such is not the case here.
Without affirming or disaffirming the decision of a majority of the court in the ease of Jennings v. Wood, 20 Ohio, 261, it is enough to say that that case is plainly distinguishable from the present one. The court there put their decision upon the ground that the note was in fact “ paid,” and not upon the ground of a merger. In the opinion of a majority of the court, the transaction amounted to an actual payment of the mortgage note by the mortgagor to the mortgagee, and a repayment of a larger sum by the mortgagee as the price of *the land. And—less the idle ceremony of passing and repassing the money—it did amount to this. As between the mortgagor and mortgagee, the debt was in fact paid and extinguished the moment the conveyance was made. Doubtless, as between the mortgagor and mortgagee, the former would have been held estopped, by his fraudulent second conveyance, from setting up that payment. Whether the innocent party claiming under him should also be estopped, under the circumstances of that ease, was the real question. There was an actual loss to be borne, either by him or by the mortgagee, and the question was, upon which pai'ty would equity cast it. The rights of the mortgagee were not placed upon the ground that the mortgage had not been paid, but rather upon the ground that, although paid, yet, by the record, it con *269 structively appeared to the purchaser not to have been paid, and that therefore he purchased with notice of a subsisting mortgage, and should bo estopped, as well as the mortgagor, from setting up the payment.
Essentially different is the present ease.
1. There is no fraud ; 2. There is no giving up or cancellation of the note; 3. There is no loss to be suffered by the party setting up the merger, in case it shall be denied. There was, in this case, simply a transfer by a member of a firm, without the consent of his copartners, of an item of the partnership assets—the equity of redemption in the lot—for his own benefit. By this transfer, Corwin took all the rights of Andrew De Graff in that equity of redemption, to be ascertained upon a final settlement and adjustment of the affairs of the concern. If upon that settlement those rights proved to be nothing, as seems to have been the fact, then Corwin took nothing by the transfer, and the equity of redemption belongs to the firm. He retained the mortgage note, taking new security for its payment, and the debt is still due to' him, and unsecured otherwise than by this mortgage.
In all this, there is certainly no absolute relinquishment of Cor-win’s rights under the mortgage. The most that can be inferred is, that he relinquished those rights upon condition that he should acquire an indefeasible title to the lot. The reason of that inference is, that it would be absurd to say *that a man can have a.mortgage upon his own land. ■ But when his title is avoided, and the land thus ceases to be his, the reason ceases, and the inference founded upon it ceases also. Nor in all this was there any fraud. All that Corwin took by the transfer from Andrew De Graff, the equity of redemption, he has kept ready to be reclaimed, at any time, by the other members of the firm. The trouble arises from the fact, that when they come to set up that claim, they are not satisfied with their equity of redemption alone, but insist on having Corwin’s mortgage also. To grant this claim would be manifestly unjust. The conveyance being avoided, Corwin is remitted to his former rights as mortgagee; and we think the court below erred in holding otherwise.
Judgment reversed, and cause remanded for further proceedings.
Scott, C. J., and Dav, White, and Brinkerhoep, JJ., concurred